**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-02606-CMA-

RICKEY LEE BUCKINGHAM, JR.,

    Plaintiff,

v.

AMERICAN MEDICAL RESPONSE AMBULANCE SERVICE, INC.,
a foreign corporation,

    Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. # 20.) For the following reasons, the Court grants Defendant's Motion.

### I. BACKGROUND

This case arose as a result of Defendant American Medical Response Ambulance Service's ("AMR's") decision to fire Plaintiff Rickey Lee Buckingham, who had been working as an AMR paramedic in Boulder, Colorado. Mr. Buckingham worked as an at-will employee at AMR from May 2005 until July 2012, during which time he advanced from the rank of emergency medical technician to paramedic and then paramedic captain. (Doc. # 20-2 at 4-17.)[1]

---

[1] Documents 20-2 and 20-3 contain selected pages of Mr. Buckingham's deposition. The Court refers to the pages by the page number they appear in this exhibit, not the page on which this testimony originally appeared in the actual deposition. This Court adheres to the same convention when referring to the depositions of other parties to this litigation.

Mr. Buckingham's termination stemmed in part from an emergency call he took on June 29, 2012, when he treated a patient who was not breathing. Mr. Buckingham decided to intubate this patient, which means he inserted a tube into the patient's trachea to assist with breathing. Mr. Buckingham then transported the patient to the emergency room at Boulder Community Hospital. (Doc. # 20-3 at 14-17.)

An ER doctor examined the patient shortly after he arrived at Boulder Community and noted the tube was located in the patient's esophagus—not the trachea. This misplacement presented a serious problem because if a tube is in not in the trachea, it cannot assist with the patient's breathing. (Doc. # 20-3 at 16-18, 22-23.)

It is unclear and disputed how the tube ended up in the patient's esophagus. The ER doctor who examined the patient did not take a position on when or how the tube became misplaced and only stated that it was in the wrong place when he performed his examination. (Doc. # 23-9 at 6.) AMR suggests that the tube **could** have been dislodged at some point *before* the patient arrived at the hospital but concedes that "no one knows for certain when or how" this occurred. (Doc. # 20 at 8.) At the same time, Mr. Buckingham strenuously argues that he correctly placed the tube in the patient's trachea, that it only became dislodged from the trachea **after** the patient entered the hospital, and that the hospital bears all blame for the fact that the tube ultimately ended up in the esophagus. (Doc. # 23.)

Regardless of who was to blame for what happened to the tube, the incident prompted an investigation into and greater scrutiny of Mr. Buckingham's work. The

investigation was conducted by Dr. Todd Dorfman, the Medical Director of AMR's Boulder Division and the doctor under whose medical license Mr. Buckingham worked.

In his investigation, Dr. Dorfman took note of several issues with Mr. Buckingham's work performance—from delayed decision-making in rapidly developing emergency situations to other clinical errors Mr. Buckingham had committed with other patients. Based on these particular deficiencies, Dr. Dorfman initially thought it would have been appropriate to demote and retrain Mr. Buckingham before giving him responsibility over any patients. (Doc. # 23-4 at 10-13, 26-29.)

Dr. Dorfman presented this idea to Bryan Fleming, the training supervisor for AMR, and Debra Hopgood, Mr. Buckingham's direct supervisor. Mr. Fleming and Ms. Hopgood, however, told Dr. Dorfman that this solution was not viable because AMR had a "no demotion" policy. As a result of this conversation, Dr. Dorfman decided to withdraw his medical direction from Mr. Buckingham, which meant that Mr. Buckingham could no longer practice under Dr. Dorfman's license. (Doc. # 20-8; Doc. # 23-4 at 11-13.)

According to AMR, no paramedic may work for AMR's Boulder Division unless he or she is practicing under the medical license of AMR's medical director. Because Dr. Dorfman withdrew his medical oversight from Mr. Buckingham, AMR made the decision to terminate his employment. (Doc. # 20-1 at 2-4.)

As a result of AMR's decision, Mr. Buckingham filed the instant lawsuit, advancing two claims. First, Mr. Buckingham alleged wrongful discharge, suggesting that in response to the intubation incident "his supervisors" insisted that he "falsely

3

record" that the tube was improperly placed *before* the patient arrived at the hospital. Mr. Buckingham alleged he was fired because he refused to put this false information into a medical report. (Doc. # 4 at 2.)

Second, Mr. Buckingham alleged that AMR improperly interfered with an agreement entered into between Mr. Buckingham and Dr. Dorfman and that this impropriety caused Dr. Dorfman to withdraw his medical supervision from Mr. Buckingham. Mr. Buckingham suggests this this behavior gives rise to a Tortious Interference with Contractual Relations Claim.[2] (*Id.*)

AMR now moves for summary judgment on both the wrongful discharge and tortious interference claims.

## II. ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. To overcome a motion for summary judgment, the non-moving party must present enough evidence to allow a reasonable jury to find in its favor. *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993). In analyzing the evidence on a motion for summary judgment, this Court must view the factual record and draw reasonable inferences in favor of the non-moving party. *Kidd v. Taos Ski Valley, Inc.,* 88 F.3d 848, 851 (10th Cir. 1996).

---

[2] In his complaint, Mr. Buckingham identifies this claim as both a Tortious Interference with Contract Claim and a Tortious Interference with Prospective Economic Advantage Claim. (Doc. # 4, at 2.) In the summary judgment response, however, he only references his Tortious Interference with Contract Claim. The Court will therefore assume that Mr. Buckingham has disclaimed reliance on the separate Prospective Economic Advantage theory.

4

The Court considers each of Mr. Buckingham's claims in turn and sets forth its reasoning for granting summary judgment to AMR as to both claims.

### A. WRONGFUL DISCHARGE

Mr. Buckingham's first claim invokes a public policy exception to the at-will employment doctrine: namely, that his termination presents a legally cognizable tort claim for wrongful discharge. In *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992), the Colorado Supreme Court recognized that such a claim arises under Colorado law. The *Martin Marietta* court further reasoned that to establish a *prima facie* case for wrongful discharge, an employee must present evidence of the following:

> [1] that the employer directed the employee to perform an illegal act as part of the employee's work[-]related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege;
>
> [2] that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker;
>
> [3] that the employee was terminated as the result of refusing to perform the act directed by the employer . . . . [and;]
>
> [4] that the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the employer's order . . . was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker.

*Id.* at 109.

Mr. Buckingham has failed to establish a *prima facie* case under this four-pronged test. As an initial matter, Mr. Buckingham does not even recite the proper

standard for establishing a *prima facie* case—the standard is only referenced in *AMR's* motion for summary judgment. (Doc. # 20 at 11.). Beyond failing to cite the proper standard, Mr. Buckingham fails to organize his briefing in a manner that explains how he meets *each* of the prongs of this test, despite AMR's specific arguments to the contrary as to *each* prong.

Indeed, what is fatal to Mr. Buckingham's position—and ultimately dispositive of his wrongful discharge claim—is his failure to make much of *any* argument related to prongs one and two of the above test. As just noted, these two elements require Mr. Buckingham to establish that: (1) AMR either directed Mr. Buckingham "to perform an illegal act" or prohibited him from performing an important "public duty," and (2) AMR's directive violated the provisions of a "specific statute" or "clear public policy."

Because Mr. Buckingham neither mentions the above standard nor specifically applies it to the facts of this case, it is difficult to know how Mr. Buckingham believes he can meet these specific elements of the *Martin Marietta* test. This central deficiency in the briefing is enough of itself to undermine his wrongful discharge claim: this Court is not required to make arguments on behalf of a party to litigation, especially a represented party. *See Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1265 n.3 (10th Cir. 2008).

Nonetheless, this Court has reviewed all the evidence in the record that might apply to these elements, and it is insufficient to establish a genuine dispute for purposes of summary judgment. Indeed, most of Mr. Buckingham's arguments regarding AMR's wrongdoing rely on little more than vague and conclusory allegations about AMR's

6

"illegal directives" (Doc. # 23, at 8) or about how he was otherwise prevented from acting in accord with an undefined "public duty." (*Id.* at 9.)

The closest Mr. Buckingham comes to advancing something more than a conclusory argument might be a portion of an affidavit he submitted in response to AMR's summary judgment motion. In the affidavit, he states:

> I believe that AMR terminated my employment because of my insistence on properly documenting the intubation incident, because there was no other cause for [AMR] to terminate my employment. As a paramedic I am required to accurately record the facts regarding patient treatment. The E.R. doctor [who treated the intubated patient] . . . claimed that the tube was misplaced before the patient reached the hospital. Deb Hopgood and Bryan Fleming also stated that it was wrong to record that the tube was misplaced at the hospital, and they told me to fill out my documentation. Upon reading my documentation again they again expressed that it was wrong to say that the tube had been misplaced at the hospital.
>
> [An exhibit attached to this affidavit is a report] I filled out. In it, I properly record that "the patient was intubated during the [ambulance] call." I had been instructed by Ms. Hopgood and Mr. Fleming no to so report, and instead to state that the patient had not been intubated during part of the call. I refused to do so and was terminated as a result.

(Doc. 23-1 at 5-6.)

For a number of reasons, the evidence contained in this affidavit is insufficient to raise any genuine dispute about whether Mr. Buckingham has established prongs one and two of the wrongful discharge standard.

First, Mr. Buckingham's allegations in the affidavit are contradicted by other record testimony. For example, Mr. Buckingham's conclusory assertion that "because there was no other cause for [AMR] to terminate my employment" other than the intubation incident flatly contradicts the record evidence documenting Mr. Buckingham's

7

prior medical errors and Dr. Dorfman's concerns about his delayed decision-making. Mr. Buckingham also mischaracterizes the testimony of the ER doctor in question. As mentioned above, the ER doctor merely noted that the tube was misplaced but **did not** opine as to **when** the misplacement occurred and never stated that the tube was "misplaced before the patient reached the hospital."

This Court will not discount the above-referenced contrary record evidence. This is especially true in the instant case, as Mr. Buckingham does not provide any explanation for these inconsistencies—indeed, he has not even taken them into account.  *Accord Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995).

Second, Mr. Buckingham notes his supervisors stated "that it was wrong to record that the tube was misplaced at the hospital," but that is not the same thing as asking Mr. Buckingham to falsify records.  To the contrary, AMR has consistently adopted the position that it is *unclear* when the tube was misplaced—they maintain that it could have occurred *before* or *after* the patient entered the hospital.  It is therefore unsurprising that Mr. Buckingham's supervisors believed it was "wrong to say" the tube was misplaced at the hospital: they are unwilling to offer as definite a position on this question as Mr. Buckingham.[3]

Further, a difference of opinion on an incident that ultimately played a role in Mr. Buckingham's termination cannot alone serve as the basis for a wrongful discharge claim.  Mr. Buckingham cites no legal authority in support of such a broad theory and

---

[3] This same reasoning holds true for Mr. Buckingham's claim that it was somehow improper for his supervisors to instruct him not to report that "the patient was intubated during the [ambulance] call."

this Court is unaware of any. Indeed, if this Court were to adhere to such a standard, then an employee could have an actionable tort claim for almost any termination that was based in part on an incident where the employee disputes what happened.

Such a rule is not only overly broad but also in serious tension with the holding of *Martin Marietta*, which requires an employer directive to violate a "*specific* statute" or to undermine "*clearly* expressed public policy." 823 P.2d at 109 (emphasis added). Indeed, while the "clear public policy" might discourage the perpetuation of a statement that was a clear fabrication, little is gained from discouraging mere professional disagreements, especially in cases such as the instant one, where both sides represent their positions with plausible interpretations of the relevant events.

Third, Mr. Buckingham provides *no* context and hardly any details for the circumstances surrounding his supervisors' allegedly problematic statements, such that it is difficult to determine how compelled he felt to act in a manner he thought was improper. Yet providing context is crucial if this Court is to effectively police the line between professional disagreements and disagreements that should be interpreted as coercive and improper employer behavior. Indeed, it is easy to envision a scenario in which an employer strenuously disagrees with an employee as to the proper way to record an incident, such that the employer and employee know that the employee will feel coerced into acting against the law. Such a scenario might also give rise to a wrongful discharge claim.

Mr. Buckingham cannot rely on such a theory, however, because he marshals no evidence to establish that the disagreement here became coercive. For example,

Mr. Buckingham has presented no evidence as to how his supervisors suggested negative repercussions that would arise specifically from his failure to present facts as they wished or otherwise tried to force him to write something with which he disagreed.[4] *Cf. Martin Marietta*, 823 P.2d at 103 (noting that the wrongfully discharged employee was asked to make modification he thought would lead to false information being included in a report and that when he refused to do so was warned to "start playing ball with management").

In light of this dearth of evidence and legal theory to support a contrary interpretation of the events giving rise to Mr. Buckingham's termination, this Court is left to conclude that Mr. Buckingham has little more than a professional disagreement with AMR about what happened on June 29, 2012. This is plainly insufficient to support a wrongful termination claim.

## B. TORTIOUS INTERFERENCE CLAIM

Mr. Buckingham also claims that AMR interfered with some sort of an implied contract that Dr. Dorfman had directly with Mr. Buckingham. The gist of this claim appears to be that Dr. Dorfman's agreement to allow Mr. Buckingham to work under his medical direction constituted some a contract between them and that AMR tortuously interfered with this relationship by forcing Dr. Dorfman to withdraw his support.

---

[4] Indeed, during his deposition, when pressed to provide specifics for how his employers asked him to falsify records, Mr. Buckingham said he could not even remember the specific words his employers used when they conveyed this supposed directive to perform an illegal act. (Doc. # 20-3 at 26.)

Mr. Buckingham cites no case law in support of this novel theory. Further, if it were viable, it would represent a new means of avoiding the effects of the at-will employment doctrine, so long as an at-will employee could point to some special relationship (such as the need to work under someone's medical license) between one employee and a supervisor indirectly involved in the decision to terminate. This cannot be the state of the law—and this Court will not endorse such an evolution of the law, especially in light of Mr. Buckingham's failure to cite any legal theory in support of his position.

### III. CONCLUSION

For the foregoing reasons, it is ORDERED that Defendant's Motion for Summary Judgment (Doc.# 20) is GRANTED. Accordingly, this case is DISMISSED WITH PREJUDICE, and the Clerk of the Court shall enter judgment in favor of Defendant and against Plaintiff. Pursuant to D.C.Colo.LCivR 54.1, Defendant may thereafter have its costs by filing a bill of costs within 14 days of the date of that order.

DATED:  January 31, 2014

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge